GUILLERMO ATILES MOREU, ADMOR. EX-REL RAMÓN CHACÓN MARTÍNEZ, demandantes y recurridos, *v.* JAMES D. MC-CLURG y CAPITAL FIRE & CASUALTY CO., demandados y recurrentes.

*Número:* 398    *Resuelto:* 26 de marzo de 1963

*F. Prieto Azúar* y *Antonio Simonpietri,* abogados de los recurrentes; *Donald R. Dexter, R. Rivera Genaro* y *Ramón Ferrer Delgado,* abogados de los recurridos.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Belaval emitió la opinión del Tribunal.

Estos hechos ocurrieron el 5 de marzo de 1958, cuando ya estaba en vigor la enmienda por adición al Art. 1802 del Código Civil de Puerto Rico (1930), disponiendo, que en un caso de daños por culpa o negligencia: "La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización." (1956)

La ilustrada Sala sentenciadora consideró probados los siguientes hechos: "Que allá para el día 5 de marzo de 1958 alrededor de las diez y cuarto de la noche y en la intersección de la carretera estatal Núm. 2 kilómetro 87 hectómetro 6 y la carretera estatal Núm. 130, mientras el codemandante Ramón Chacón Martínez se encontraba en funciones de su empleo como bombero y mientras se dirigía a apagar un fuego conduciendo una bomba para extinguir incendios,—autocamión Chevrolet 1957, tablillas GE 1-065—, a velocidad moderada fue chocada por un vehículo de motor marca Studebaker 1955, tablillas 133-052, propiedad del codemandado James D. McClurg y conducido por éste al momento del choque; que el codemandante Ramón Chacón Martínez, la noche en que ocurrió el accidente, venía guiando la bomba para extinguir incendios desde el parque de bombas del pueblo de Hatillo, tocando una sirena, oíble a 5 millas a la redonda hasta el momento en que el codemandado McClurg chocó con la bomba para extinguir incendios; que el codemandante Ramón Chacón Martínez al ir a cruzar la carretera militar re-

dujo la velocidad de la bomba para extinguir incendios y no vio luces de vehículo que se proyectaran en la carretera militar anunciando la proximidad de vehículos que cruzaran o pudieran aproximarse a cruzar la intersección; que de acuerdo con la prueba de los demandados la noche en que ocurrió el accidente no llovía y el codemandado McClurg traía subidos los cristales de su automóvil, con excepción de una de las ventanillas pequeñas laterales; que el codemandado McClurg vio la luz de la bomba para extinguir incendios cuando había reducido en 15 millas la velocidad de 45 millas a que venía, o sea, cuando su velocidad era de 30 millas por hora, a una distancia de 30 ó 50 pies del sitio donde ocurrió el choque y por lo tanto, tuvo tiempo suficiente para frenar su vehículo y evitar el choque; que el accidente a que se refiere esta demanda se debió única y exclusivamente a la culpa y negligencia del codemandado James D. McClurg, quien conducía el vehículo de motor anteriormente descrito a una velocidad exagerada sin tomar las precauciones necesarias al no estacionarse al lado derecho de la carretera, "toda vez que la referida bomba . . . conducida por el codemandante Ramón Chacón Martínez venía dando aviso oíble con su sirena antes de lanzarse a cruzar a poca velocidad la intersección de las carreteras donde ocurrió el accidente y que a pesar del aviso oíble dado con la sirena el codemandado James D. McClurg no redujo ni detuvo la marcha ni se alineó a la derecha, lanzando negligentemente dicho automóvil contra la bomba de incendio."

Como cuestión de derecho, concluyó que: "El accidente descrito en la demanda se debió únicamente a la negligencia del codemandado James D. McClurg conductor del vehículo asegurado de la Capital Fire & Casualty Co. sin que el codemandante Ramón Chacón Martínez incurriera en *negligencia contributoria*." (Bastardillas nuestras.)

La ley aplicable al caso, de acuerdo con la fecha en que ocurrió el accidente, es, el Art. 17 de la Ley Núm. 279 de 5 de abril de 1946, según enmendado por la Ley Núm. 492 de

15 de mayo de 1952, la Ley Núm. 96 de 18 de junio de 1953— 9 L.P.R.A. sec. 187—que dispone: "(a) Las personas que manejen vehículos en los caminos públicos, deberán en todo tiempo ejercer el debido cuidado y tomar precauciones razonables para garantizar la seguridad de vidas y propiedades ... (g) El conductor de un vehículo de motor que se acerca a una intersección cederá el derecho de paso a todo vehículo que haya entrado en la intersección viniendo de otra vía pública. El conductor del vehículo guiado por un camino vecinal, municipal o privado, cederá el derecho de paso a todo vehículo conducido por una carretera estadual; *Disponiéndose*, que cuando ambos vehículos fueren conducidos por carreteras estaduales, el que procediera de la carretera de menor tránsito cederá el derecho de paso al que procediera de la carretera de mayor tránsito. Las anteriores disposiciones de este apartado se aplicarán cuando el tránsito no estuviere regulado por señales de tránsito o policías de tránsito. Todo conductor de vehículos de motor cederá el derecho de paso a las bombas de incendio, ambulancias y vehículos de la Policía de Puerto Rico, cuando éstos vayan en diligencia de emergencia y cuando los conductores de dichos vehículos den avisos oíbles, como campanas, sirenas o pitos; todo conductor al acercarse cualquiera de los vehículos de emergencia indicados, dando los avisos oíbles mencionados, deberá colocar su vehículo bien hacia la derecha y detendrá la marcha hasta que haya pasado el vehículo de emergencia."

En su revisión ante nos, el demandado recurrente señor McClurg señala los siguientes errores: (1) Las conclusiones de hecho de la Sala sentenciadora no están sostenidas por la prueba y son contrarias a la misma; (2) la Sala sentenciadora erró al concluir que el recurrente, a una velocidad de 30 millas por hora podía detener su vehículo en 30 ó 50 pies luego de frenar; (3) erró al concluir que el recurrido marchaba a velocidad moderada, cuando la prueba demostró que el impacto violento producido por la bomba para extinguir

incendios sacó el automóvil de la carretera, destrozándolo y esa evidencia física tiene un valor probatorio *per se;* (4) erró al concluir que el recurrente, quien por derecho preferente de paso, se hallaba ya dentro de la intersección, debió detener su vehículo a la derecha; (5) erró al no hacer conclusión ni atribuir importancia (a) a la admisión del recurrido de que no observó el letrero "pare" en la intersección, ni (b) sobre el hecho de que los frenos de la bomba para extinguir incendios habían estado defectuosos; (6) erró al conceder una indemnización por daños exagerada y confiscatoria, no obstante ser de naturaleza leve las lesiones del recurrido; (7) erró al no admitir en evidencia un escrito oficial del Dr. Nathan Rifkinson dirigido al Fondo del Seguro del Estado en el cual informaba que no apreciaba signos neurológicos de incapacidad y (8) erró al no aplicar la regla de la negligencia comparada y no adjudicar en tal virtud una compensación por daños compatibles con el grado de negligencia del recurrido.

1—El recurrente tiene razón en cuanto a que algunas de las conclusiones de hecho de la ilustrada Sala sentenciadora no corresponden con la preponderancia de la prueba o de la prueba no contradicha por la adversa. Algunas de las aseveraciones, sobre todo las indicadas entre comillas en la relación anterior, son meras reproducciones de las alegaciones, según veremos.

2—Cuando estos hechos ocurrieron, la ley que regía la velocidad permisible para cruzar una intersección era el Art. 15 de la Ley Núm. 279 de 5 de abril de 1946, según enmendada por la Ley Núm. 1 de 5 de agosto de 1957, que disponía una velocidad no mayor de 15 millas por hora cuando el conductor del vehículo no pudiera ver claramente los vehículos que se acercaren o pudieran acercarse a dicha intersección dentro de un límite de 50 metros en todas las direcciones, excepto en aquellas intersecciones en que el tránsito estuviera regulado por luces en cuyo caso el conductor que tuviera derecho a seguir podría hacerlo a la velocidad fijada para la zona urbana (25 millas). El recurrente Mc-

Clurg declaró que "poco tiempo antes de la intersección yo iba manejando alrededor de 45 millas por hora, (límite permisible a una zona rural, según el mismo Art. 15). Según me acercaba a la intersección yo reduje mi velocidad (t. 44); la intersección estaba aparentemente clara". (t. 45) En contrainterrogatorio declaró, que al acercarse a la intersección, aproximadamente, iba a 10 ó 15 millas por hora. (t. 51) La conclusión de la ilustrada Sala sentenciadora que el recurrente señor McClurg iba a una velocidad exagerada es contraria a la prueba.

3—En cuanto a la velocidad a que venía la bomba para extinguir incendios, la prueba contiene las siguientes aseveraciones: El codemandante recurrido señor Chacón declaró: "Como a las diez de la noche nos avisó un señor, el señor Luis Toledo, del barrio Capáez de Hatillo, que había un fuego de caña, en la cual había muchas casas que corrían peligro, y nosotros fuimos a prestar el servicio para apagar el incendio." (t. 5) Después añade: "Bueno, no iría despacio iría como a 10 ó 15 millas." (t. 12) El otro empleado del Parque de Bombas, que acompañaba al codemandante recurrido señor Chacón, el señor Antonio Delgado, declaró: "Pasamos por el pueblo (Hatillo) a diez millas, después al llegar allí (la intersección) reducimos la velocidad." (t. 22) En el contrainterrogatorio, sin embargo, aclaró: "Bueno en el pueblo pasamos a diez millas; después que salimos del pueblo íbamos como a 25 millas." (t. 24) El señor Longinos Mercado, comerciante, con un establecimiento situado en el cruce de la carretera Núm. 2 y la carretera 130, intersección donde ocurre el accidente, único testigo desinteresado, declaró: "En el momento en que yo me disponía a cerrar mi negocio, sentí una sirena de alarma . . . y cuando ví que era el carro de los bomberos, la bomba de incendio" (t. 37); la bomba no se detuvo ante un letrero de "pare" sino que continuó su marcha, ligero (t. 38). "El carro Studebaker fue chocado por el carro de los bomberos, que lo arrastró y lo sacó fuera de la carretera". (t. 39) Continúa el señor Longinos Mer-

cado: El impacto fue bastante violento (t. 39); hubo un muerto (t. 39) en el carro Studebaker (t. 40) y al señor Mc-Clurg "lo sacamos inconsciente del carro; yo primero tuve que sacar al otro, muerto, y lo puse en una guagua que lo trajo a Arecibo y este señor (McClurg) quedó pinchado entre el guía y la puerta que estaba doblada" (t. 40); "la bomba se cruzó en la carretera Núm. 130, y el carro quedó más acá, entre la carretera militar y un alcantarillado que hay" (t. 41). El señor McClurg declaró: "Cuando entraba en la intersección hubo un resplandor de luz en la derecha mía ... puse mis frenos y desvié hacia mi izquierda ... para evitar una colisión porque el carro venía bastante ligero (t. 45) ... Según puse mis frenos y me desvié a la izquierda, el carro seguía viniendo y ocurrió la colisión (t. 46). Después añade que todo lo que puede recordar es que hubo un impacto que lo tumbó a él dejándolo inconsciente, un impacto bastante severo. (t. 46)

Tanto por las aseveraciones directas de los testigos, como por las inferencias que pueden hacerse sobre la descripción del impacto, es claro que la conclusión de la ilustrada Sala sentenciadora, en el sentido, que la bomba para extinguir incendios era conducida a una velocidad moderada, resulta contraria a la prueba: *Pueblo* v. *Rivera*, 69 D.P.R. 538, (Todd hijo) (1949), cita precisa a la pág. 543; *Pueblo* v. *Santiago*, 56 D.P.R. 763 (De Jesús) (1940), cita precisa a la pág. 767; *Efret* v. *Quiñones*, 40 D.P.R. 192 (Texidor) (1929), cita precisa a las págs. 196–197.

4—En cuanto a la obligación del recurrente señor Mc-Clurg de estacionar su vehículo de motor a la derecha para darle paso preferente a la bomba para extinguir incendios, la prueba debe demostrar que la bomba se dirigía en ese momento para cumplir una diligencia pública de emergencia y que venía haciendo sonar sus aparatos de alarma. No hay duda, en este caso, que al momento del choque, la bomba se dirigía a extinguir un incendio, y que al momento de cruzar la intersección venía sonando la sirena empleada para pre-

venir a los otros conductores de tal diligencia pública de emergencia. El codemandante recurrido señor Chacón declaró: "Bueno, salimos el compañero que iba al lado mío, Antonio Delgado, puso el pie a la sirena y seguimos hacia el pueblo" (t. 5–6); que en el momento de cruzar se tocaba la sirena (t. 6). El otro empleado que iba en la bomba para extinguir incendios declaró que él "iba tocando la sirena desde que salimos del Parque"; que esa sirena puede ser oída a cinco millas a la redonda y que al reducir la velocidad para cruzar, la sirena estaba tocando (t. 22); que cuando salieron del Parque eran las diez y pico de la noche y el accidente ocurrió a las diez y cinco, una cosa así. Después declara que salieron del parque de las diez y cinco a las diez y diez (t. 23); que la distancia que hay entre el Parque de Bombas de Hatillo y el sitio del accidente era como de un hectómetro o dos que puede recorrerse entre diez y cinco minutos. (t. 24) El testigo Longinos Mercado, según hemos visto, declaró que al disponerse a cerrar su negocio sintió una sirena de alarma y vio que era el carro de los bomberos (t. 37); dice que esa bomba venía tocando sirena y que la sirena se oía bien lejos (t. 40). El recurrente señor McClurg declaró que no recuerda si la noche del accidente llovía, que los cristales de su automóvil estaban arriba (subidos) menos la ventanilla en el lado del conductor que estaba abierta (t. 49). Refiriéndose a la posibilidad que él hubiese oído la sirena, declaró: "Yo diría que yo podía oir, no sé exactamente como decirlo, usted podría oir, pero sería un sonido amortiguado"; que posiblemente podía oir algún claxon o una sirena o alarma que tocara una ambulancia, pero que no oyó, antes del accidente, la sirena de un vehículo tocando. (t. 50)

La versión que ofrece la prueba del codemandante recurrido Chacón, en el sentido, que la sirena de la bomba para extinguir incendios podía oirse a cinco millas a la redonda, nos parece, no sólo exagerada sino un supuesto que necesitaría de un espacio físico ideal en el cual la onda del sonido no pudiera estar interceptada por otros objetos o cuerpos

sólidos que tendieran a amortiguarla. De todos modos, dentro de las reglas de la prueba conjetural, es posible inferir, vista la declaración a tal efecto del único testigo desinteresado, que al aproximarse a la intersección y al momento de cruzarla, la bomba hacía sonar su aparato de alarma. Siendo esto así, resulta clara la obligación del señor McClurg de estacionarse a la extrema derecha de la carretera por la cual transitaba.

5—De acuerdo con nuestra actual legislación sobre negligencia, era obligación de la ilustrada Sala sentenciadora, según señala el condemandado recurrente, hacer conclusiones de hecho sobre la omisión del codemandante recurrido de obedecer la señal de precaución "pare" situada antes de llegar a la intersección y sobre el estado defectuoso de los frenos, teniendo en mente, que si bien el Art. 17 de la Ley Núm. 279, según enmendada, antes transcrito, dispone que "todo conductor de vehículo de motor cederá el derecho de paso a las bombas de incendio . . ." es asimismo obligación de los conductores de las referidas bombas al cruzar una vía con derecho de paso preferente "tomar precauciones para la seguridad de las vidas y propiedades ajenas": *Vélez ex rel González* v. *Atlas Lines*, infra. De haber hecho dichas conclusiones, es indudable que la ilustrada Sala sentenciadora habría concluido que el codemandante recurrido no actuó con la debida prudencia y circunspección y que los frenos de la bomba para extinguir incendios estaban gastados, ese mismo día hubo que repararlos dos veces y que el otro empleado le advirtió al codemandante recurrido, antes del accidente, sobre la condición defectuosa de dichos frenos, todo lo cual claramente demuestra, que en la comparación de culpas, el codemandante recurrido no puede considerarse totalmente exento de responsabilidad.

6–7—La ilustrada representación del codemandado recurrente señor McClurg, tiene razón al afirmar, que la indemnización por daños concedida en este caso resulta exage-

rada y confiscatoria al comparársele con las lesiones recibidas por el codemandante recurrido señor Chacón.

El codemandante recurrido declaró, en cuanto a las lesiones, haber recibido "un tajo en la cabeza guayadura por este lado y este lado izquierdo, en una rodilla y un tajo en un dedo" (T.E. pág. 6.) ; que de las lesiones "no me siento muy bien todavía . . . me dan mareos, me dan dolores en la cabeza, en la cintura en este lado, me dan mareos, dolores de cabeza, el sol me molesta a mí" (T.E. pág. 7.) ; que el Fondo del Seguro del Estado le reconoció un 5% de incapacidad en una rodilla (T.E. pág. 7.) ; que al mes reanudó su trabajo de bombero y que algunas veces conduce la misma bomba "algunas veces no puedo, porque me da una cosa en la cabeza, que no puedo" (T.E. pág. 17.) ; que el Fondo del Seguro del Estado le dio $150 por la incapacidad aparte de las dietas. El doctor José M. Rodríguez Quiñones declaró que el codemandante recurrido estuvo recluido en su clínica desde el 5 de marzo de 1958 hasta el 16 de marzo, once días por todo (T.E. pág. 19.) ; que "el paciente fue ingresado en la clínica por tener una herida contusa en la región fronto-parietal, una laceración en el cuarto espacio inter-digital del pie izquierdo; contusiones múltiples, entre ellas, en el hombro izquierdo; la región lumbar y la rodilla izquierda" (T.E. 19.) que: "El paciente yo lo ví en estos días y está en bastantes buenas condiciones. El único problema que yo tendría en decidir es qué efecto tiene como resultado del golpe en la cabeza" (T.E. pág. 20.) que "los golpes en la cabeza son casi siempre graves, pero no siempre pueden ser graves, debido al efecto que pueda producir en la masa encefálica" y que podría sufrir alguna incapacidad en el futuro. (T.E. pág. 20.) Al preguntársele si el lesionado podría continuar con "dolores de cabeza, convulsiones, esos mareos que él dice que le dan podrían ser consecuencia de ese golpe", el perito médico contestó: "Yo no puedo determinar con certeza, podría sí o no" (T.E. pág. 20.) ; que *puede* tener consecuencias graves en el futuro (T.E. págs. 20–21.) La determinación pe-

ricial sobre estos daños futuros estuvo a disposición de la ilustrada Sala sentenciadora pero ésta rechazó la certificación del doctor Nathan Rifkinson expedida a solicitud del Fondo del Seguro del Estado, en el cual informaba que no descubrió signos neurológicos de incapacidad, motivados por el accidente, en el codemandante recurrido señor Chacón.

■ La ilustrada representación del codemandado recurrente señor McClurg, tiene razón asimismo, al afirmar, que fue un error de la ilustrada Sala sentenciadora no admitir como prueba dicha certificación. Según se resolvió en el caso de *Negrón* v. *Corujo*, 67 D.P.R. 398 (Marrero) (1947), cita precisa a la pág. 401, la admisión de documentos, expedientes o legajos públicos constituyen una excepción a la prueba de referencia porque "tales documentos o expedientes son preparados por personas que no tienen motivo alguno para suprimir o alterar la verdad . . . son además preparados en el desempeño de un deber público y casi siempre bajo la sanción de un juramento oficial . . ."

La indemnización de $6,000 concedida al codemandante recurrido señor Chacón no guarda proporción con las lesiones que recibiera. Es conveniente además dejar consignado que el Fondo del Seguro del Estado, por concepto de dietas, incapacidad, radiografías, gastos de viajes, hospitalización y asistencia médica, sólo satisfizo y reclama en esta acción la cantidad de $306.93. Antes de fijar la nueva compensación, es necesario disponer del último error señalado.

8—Estos hechos ocurrieron el 5 de marzo de 1958, cuando ya estaba en vigor la enmienda al Art. 1802 del Código Civil de Puerto Rico (1930) adicionada por la Ley Núm. 28 de 9 de junio de 1956, que en cuanto a la reparación del daño causado por culpa o negligencia, dispone: "La imprudencia concurrente del perjudicado no exime de responsabilidad pero conlleva la reducción de la indemnización." El término "imprudencia concurrente", sin duda, constituye un acierto en lexicografía legal, pues según comenta Manresa: "El hombre, ha dicho un autor, debe subordinar todas sus acciones

a las reglas y preceptos de la prudencia"—12 Manresa—*Comentarios al Código Civil Español* 639, (quinta edición Reus 1951). Por nuestra parte, en el caso de *Pagán* v. *Guardiola*, 78 D.P.R. 388 (Belaval) (1955) cita precisa a la pág. 391, resolvimos, siguiendo el lenguaje de una sentencia española: "La obligación de indemnizar daños y perjuicios dimanantes de un hecho ilícito, responde en la esfera cuasidelictual, a la falta de prudencia o diligencia que normalmente es debida en el ámbito de la convivencia humana."

■ Cuando aún no estaba en vigor la enmienda de la "imprudencia concurrente", en el caso de *Vélez ex rel González* v. *Atlas Lines*, 78 D.P.R. 773 (Belaval) (1955), cita precisa a las págs. 775–776, establecimos para esta clase de accidentes, la siguiente norma: "El conductor de la ambulancia tenía derecho a suponer que encontraría la vía franca, no sólo por la diligencia de emergencia en que se ocupaba sino también por el aviso oíble que venía dando a tal efecto. El cuidado tutelar principal en una situación como ésta, la ley se lo impone al conductor del vehículo que se ocupa en una tarea de transportación normal y no al conductor del vehículo que se ocupa en una tarea de transportación de emergencia. Aunque la diligencia de emergencia no le da derecho al conductor de una ambulancia, de arrollarlo todo a su paso, sin tomar precauciones para la seguridad de las vidas y propiedades ajenas, le da derecho al uso preferente de la vía franca a una mayor velocidad que la que ordinariamente puede aplicar otro conductor de un vehículo de transportación."

Después de la enmienda de la "imprudencia concurrente", entendemos que la norma sigue siendo la misma, igual cuidado para ambas partes aunque dentro del cuidado se reconozca una preferencia en el paso a la persona que se ocupa de una diligencia de emergencia. Esto obliga a las salas sentenciadoras a comparar las culpas como si se tratara de un caso corriente, concediendo algún margen a favor del conductor que realiza una diligencia de emergencia, al momento de determinar su responsabilidad.

El error de la ilustrada Sala sentenciadora fue considerar este caso como si todavía estuviera regido por el principio ya superado de la exclusión de responsabilidad en caso de existir negligencia contributoria. Comparadas las culpas en esta causa es evidente que la única por la cual se pueda responsabilizar al codemandado recurrente señor McClurg es no haber detenido su vehículo para darle paso a la bomba para extinguir incendios. Si esto hubiera ocurrido mientras transitaban ambos por la misma vía y la proximidad del aviso hubiera sido más oíble, su imprudencia sería mayor. Pero, hay ciertas circunstancias en este caso que nos permiten inferir que la onda del sonido no creara esa sensación de proximidad que hace más imperativo tomar las medidas de seguridad tan rápidamente como hubiera sido aconsejable en una situación distinta.

■ De todos modos, aun en el supuesto de la total exclusión de culpas, la compensación sería excesiva. Creemos llegado el momento de llamarle la atención a las Salas sentenciadoras sobre la necesidad de medir los daños y perjuicios en cada caso sobre una estricta base de correspondencia con la prueba, siempre procurando que la indemnización de los daños y perjuicios no se convierta en una industria y no resulte tan lesiva a nuestra economía—*Toro Mercado* v. *P. R. & Amer. Ins. Co.*, 87 D.P.R. 658 (Blanco Lugo) (1963), cita precisa a la pág. 660—como en algún momento anterior, resultó ser la tendencia a no compensar debidamente el daño. Usando de las palabras de nuestro ilustrado compañero Juez señor Santana Becerra podríamos añadir: "Este menester de los Jueces [fijación de daños] debe estar presidido por un sano juicio y por criterios razonables y ponderados en la evaluación de cada caso, con objetividad de la realidad probada, de modo que siempre se conserve el sentido remediador del resarcimiento, que impone el Art. 1802 y el accidente no sea motivo de especulación o ganancia." *Vda. de Valentín* v. *E.L.A.*, 84 D.P.R. 112 (Santana Becerra) (1961), cita precisa a la pág. 123.

No se presta este caso a una distribución detallada de la compensación debida a cada parte, y en su efecto, la correspondiente al codemandante recurrido señor Chacón, pues el caso se llevó en el supuesto de responsabilidad excluida de la negligencia contributoria y las indemnizaciones se solicitan en acciones separadas. Guiándonos por un criterio práctico que no resulte reñido con la justicia sustancial, creemos que debe modificarse la sentencia concediéndole al Fondo del Seguro del Estado—hasta cierto extremo un interés inocente—la totalidad de lo gastado en el tratamiento del codemandante recurrido señor Chacón, o sea, la cantidad de $306.93 y por encima de dicha cantidad, concederle al codemandante recurrido Ramón Chacón Martínez la cantidad de seiscientos cincuenta dólares ($650) más las costas y $200 para honorarios de abogado.

*Debe modificarse la sentencia en estos términos.*