Pesante Martínez, Juez Ponente
*652 TEXTO COMPLETO DE LA SENTENCIA
Mediante el recurso de título, comparecen ante nos los apelantes, Luis Lebrón Dávila, Juan Lebrón Casanova y Javier Cruz de Jesús, todos por sí y en representación de la Sociedad Legal de Gananciales compuesta por sus respectivas cónyuges, y la Compañía Aseguradora ABC, Inc., procurando la revisión de una sentencia enmendada dictada el 15 de agosto de 2003 por el Tribunal de Primera Instancia, Subsección de Distrito, Sala de Salinas (en adelante, “TPF’). Mediante la misma, el TPI declaró ha lugar la acción sobre daños y perjuicios incoada por la parte apelada Néstor Maldonado Santiago y Ada Cintrón Santiago. En su consecuencia, condenó únicamente a los apelantes Lebrón Dávila, Lebrón Casanova y Cruz de Jesús a pagar solidariamente $75,000 al apelado Maldonado Santiago y $45,000 a la apelada Cintrón Santiago, ambas cuantías por concepto de sufrimientos y angustias mentales, más las costas y gastos del pleito. Además, la sentencia apelada desestimó la reconvención presentada por los apelantes.
Luego de estudiado los hechos y el derecho aplicable, se modifica la sentencia recurrida para reducir la compensación concedida a los apelados, y así modificada, se confirma.
I
La parte apelada', Maldonado Santiago, declaró que el 3 de diciembre de 1999, día de los hechos, que se encontraba trabajando en la Fábrica Altama Delta, P.R. de Salinas. Se fue la energía eléctrica cuando iba a reparar una máquina. Salió fuera de la edificación de la fábrica al pasillo donde todas las operarías estaban.
Al Maldonado Santiago preguntarle al apelante Lebrón Dávila si iban a traer más máquinas, ya que una tal Lourdes Richetti le había informado que las máquinas no funcionaban adecuadamente y no devolvían el dinero, dicho apelante le contestó que “eran mal agradecidos” y que “el [sic] había dejado un ‘petty cash’ para devolver la diferencia.” Maldonado Santiago indicó que Lebrón Dávila estaba molesto y cogió dinero, lo puso sobre un banco de trabajo y les dijo “ahí tienen”. El apelado le dijo que “no es que fueran mal agradecidos y que todo en la vida tenía límite ”. En eso, Lebrón Dávila le contestó que “no fuera metió, cuidao, Puerto Rico es muy pequeño”. El hijo de Lebrón Dávila, el también apelante Lebrón Casanova, le dijo que se fuera “pal carajo”. Maldonado Santiago le contestó: “no, pa allá te vas tú”. En ese entonces, Lebrón Casanova agredió a Maldonado Santiago en la cara, el pecho y en los dientes. Maldonado Santiago acotó que “Luis padre, me cogió por la mano izquierda y Javier me agarró por la derecha y el hijo (refiriéndose a Lebrón Casanova), me daba de frente. Me removieron los dientes, se desalinearon los dientes, yo tiré patás [sic], a Luis hijo y éste me dio por la parte de atrás. Las operarías de la fábrica empiezan a gritar y me le salí de las manos a ellos y me adentré al edificio”. Una vez adentro del edificio, Maldonado Santiago refiere que encontró un instrumento de romper costura, una especie de bisturí. Allí aparecieron compañeros de trabajo y lo interceptaron, entre ellos, Alberto Mercado. Dice Maldonado Santiago que estaba “achocado” “desbalanceado”, y el compañero de trabajo Mercado lo llevó para adentro de la fábrica, por lo que no pudo hacer nada con el bisturí que encontró.
Al poco tiempo aparecieron en el lugai; de los alegados hechos agentes de la policía los cuales llevaron a Maldonado Santiago a un hospital cercano. Allí le suministraron al apelado servicios de primeros auxilios como medicamentos y suero por varias horas, además de indicarle qúe no podría ser conducido de Salinas a Juana Díaz debido al trauma sufrido y a los medicamentos suministrados. Con posterioridad a ello, los agentes se marcharon del hospital sin detener a Maldonado Santiago como resultado de los hechos de referencia.
La parte apelada indicó que al llegar a su hogar se le hizo difícil acostarse por el fuerte dolor que sentía en *653 cualquier posición que se acostara por lo que tuvo que ser trasladado al Hospital Dr. Pila, en el Municipio de Ponce. Una vez dado de alta, se reportó su caso a la Corporación del Fondo del Seguro del Estado (“FSE”). El apelado añade que el domingo, 5 de diciembre de 1999 Maldonado Santiago informa haber recibido llamada de su jefe quien preguntó si iba a regresar a trabajar ese mismo lunes, razón por la cual le informó en la negativa, debido a su condición de salud.
Así las cosas, en el FSE le informaron al apelado que tenía fractura en la tercera y cuarta costilla, por lo que tenía que verse obligado a dormir sentado. Luego de recibir tratamiento “en descanso” por la referida entidad, el 12 de junio de 2000 fue dado de alta y se le autorizó a que continuara recibiendo tratamiento mientras trabajaba, lo que se conoce como “CT', por lo que acudió a su trabajo donde laboró poco más de media jomada ese día. En Altama Delta le indicaron que no podía regresar a trabajar hasta tanto y en cuanto no estuviese “cien por ciento” recuperado. Maldonado Santiago alega que aun cuando les indicó que por recomendación del FSE podía regresar al trabajo, “la orden de ellos [Aljama] está por encima del [FSE]”.
El apelado señaló que no recibió ninguna ayuda económica por parte de su patrono; una vez fue dado de alta, fue suspendido verbalmente y nunca trabajó en ningún lugar, luego del accidente, por lo que solicitó ante el Departamento del Trabajo los beneficios de compensación por desempleo y se lo aprobaron. En el ínterin, Maldonado Santiago adujo haberse sentido deprimido, por lo que acude a sicólogos, psiquiatras, demás profésionales de la salud y al Dr. Berrios, su médico de cabecera. El apelado señaló que luego de los incidentes de referencia, las relaciones íntimas con su cónyuge se vieron afectadas negativamente. “Los nervios me atacan cuando quiero compartir con mi esposa", enfatizó Maldonado Santiago. Añadió además que su situación económica se encontraba en precarias condiciones, por lo que tuvo que acogerse al beneficio de cupones de alimentos.
A preguntas de la representación legal de los apelantes, Maldonado Santiago reiteró que se encuentra deprimido. Narró que el día de los hechos llegó a trabajar a eso de las siete de la mañana. Aceptó que conocía a Lebrón Dávila, quien identificó como el encargado de llenar las máquinas de refrescos. Maldonado Santiago negó haber agredido a Lebrón Dávila, estableciendo que “no hice contacto físico con él”, e informó que los tres apelantes lo agredieron.
La testigo Richetti Rodríguez, quien se desempeña como operaría de Altama Delta, declaró que Maldonado Santiago, del cual identificó laboraba como mecánico de la fábrica, allá para el 3 de diciembre de 1999, observó cómo el apelado era sujetado mientras recibía golpes, mas no vio cuándo Maldonado Santiago alegadamente tomó el instrumento o bisturí en sus manos ni supo quién se lo quitó. Finalmente, declaró que el agente Luis Gonzaga Santiago, a cargo de la investigación del caso, habló con ella tres o cuatro semanas después del incidente al cual le ofreció lo observado por ella el día de los hechos.
El agente Gonzaga Santiago declaró que encontró a Maldonado Santiago golpeado. Gonzaga Santiago reveló que los hechos suscitados comienzan cuando los apelantes van a la fábrica a recoger las máquinas de vender golosinas. En el proceso de extraer de las mismas las ganancias de las mismas, de su investigación se desprende que Lebrón Dávila le dijo a Maldonado Santiago que “Puerto Rico es muy pequeño. Te vamos a coger afuera”. Acto seguido, los apelantes patearon a Maldonado Santiago, éste cogió en sus manos una especie de bisturí, corrió hacia los apelantes y De Jesús Cruz se lo quitó de las manos antes de que pudiese agredir a alguien.
Gonzaga informó que llevó a Maldonado Santiago al hospital donde informó que le fue tratado como consecuencia de los severos golpes recibidos en los labios y ojo izquierdo, que le fracturaron las costillas 3 y 4, le aflojaron los dientes y le administraron suero. Luego de llevarlo a la fábrica de vuelta, y una vez estando en el cuartel, tomó los datos personales de los apelantes y los .citó para entrevistarlos más adelante como parte de su investigación. Finalizada la misma, el 24 de enero de 2000, el agente Gonzaga prestó declaración jurada ante el *654 magistrado donde describió los hechos cometidos el 3 dé diciembre de 1999, bajo supuesta violación al Art. 94 del Código Penal, 33 L.P.R.A. see. 4031 (Agresión simple) por parte de los tres apelantes. Gonzaga indicó que nunca recuperó de la escena el bisturí que supuestamente tomó Maldonado Santiago en sus manos al ser agredido por los apelantes.
La parte apelada, Cintrón Santiago, quien es esposa de Maldonado Santiago, declaró que el día de los hechos se quedó en Dr. Pila cuidando a su esposo y “[l]o vi con la cara llena de moretones” y que éste tenía que dormir de pie. Con posterioridad a llevarlo al FSE el 6 de diciembre de 1999, pudo atestar su estado depresivo e informó que padecía de epilepsia, la cual indicó se agravó luego del incidente. Estableció que las relaciones íntimas son pocas o ninguna entre ella y su esposo, debido al efecto de medicamentos recetados. Añadió que, a pesar de que su esposo trabajó por cerca de veintisiete años, aun padeciendo de epilepsia, la tenía controlada, pero, debido a los incidentes, la misma había agravado. Que no podía trabajar por las severas convulsiones que ahora sufría. Finalmente, describe que las relaciones de Maldonado Santiago con sus hijos son pésimas, que siempre está enojado y que se ha visto afectado en lo íntimo y en lo económico como producto de los incidentes. Finalmente, informó que la situación económica se agravó cuando solicitaron los beneficios del Seguro Social, los cuales le fueron denegados.
El Dr. Pedro A. Berrios Ortiz, médico de cabecera de Maldonado Santiago, constató mediante sus declaraciones que su paciente padece de epilepsia y que recibe tratamiento profiláctico de por vida. Le recetó [medicamento]. Lo visitaba cuando le aparecía la crisis. El tratamiento de epilepsia es para toda la vida. El doctor Berrios señaló haber notado que los ataques de epilepsia aumentaron de uno a dos semanales, cuando antes del incidente eran mensuales o cada 15 días. Informó, además, que Maldonado Santiago recibió medicamentos para mejorar las relaciones sexuales, pero no se obtuvo éxito. Berrios indicó que el apelado no puede trabajar, ya que los ataques han aumentado, que no se puede predecir cuándo le van a dar los ataques epilépticos, que padece de insomnio, que como producto de la fractura de las costillas, quedará un remanente para toda la vida. Añade que Maldonado Santiago tiene un 60% de incapacidad en sus funciones generales, cuando la incapacidad era de un 10% antes de los incidentes.
Como resultado del incidente objeto de este pleito, a Maldonado Santiago también se le afectó su visión y fue referido al oftalmólogo para que le ofrecieran un tratamiento adecuado.
Por su parte, el apelante Lebrón Dávila declaró que no fue al médico como consecuencia del incidente, aun cuando Maldonado Santiago supuestamente le dijo malas palabras y le propinó un golpe. Alegó que escuchó a su hijo, el apelante Dávila Casanova decirle “[l]e voy a dar papi” y lo vio “caerle encima” a Maldonado Santiago sin que nadie aguantara al apelado. Lebrón Dávila aceptó que habló con el agente Gonzaga y añadió que, en una ocasión ajena a los hechos que provocaron el incidente de marras, recibió un tiro en un asalto y que el incidente le ha provocado “que sale brincando de la cama”. Apuntó que nunca ha ido a ningún médico.
A su vez, el apelante Lebrón Casanova declaró que Maldonado Santiago le dijo, “mételos [las pesetas extraídas de las máquinas de golosinas ubicadas en la fábrica] por el culo porque yo tengo más chavos que todos”. En ese momento, Lebrón Casanova alega haberle dicho a su padre que iba a “encajar en el puño” a Maldonado Santiago, “me cegué y le di [sic] con todas las fuerzas de mi alma” (refiriéndose al co-demandante, Maldonado Santiago). Lebrón Casanova refiere que escuchó decir “corre, que te matan” y corre alrededor de la Van. Lebrón Dávila se metió dentro de la guagua mientras Maldonado Santiago trataba de agredirlos con una cuchilla, pero Cruz de Jesús se la quitó antes de que pudiese agredir a alguien con ella. Dijo Lebrón Casanova que en los tres años que han pasado, jamás ha acudido a un sicólogo, siquiatra o a cualquier otro médico y manifestó que no recibió ningún daño. Lebrón Casanova no recordó cuántas patadas le dio Maldonado Santiago, ni supo determinar si le había roto las costillas como producto de dichas patadas.
El TPI determinó que, como resultado de la apreciación de la prueba ante ellos desfilada, resultó indudable *655 concluir que los apelantes Lebrón Dávila, Lebrón Casanova y Cruz de Jesús fueron responsables de los daños alegados y probados por los apelados. De igual forma, el foro apelado señaló que no se desprendió de dicha prueba que las cónyuges de los apelantes hayan sido en alguna forma responsables de los actos que éstos llevaran a cabo o que dichos actos hubiesen aprovechado económicamente a las sociedades gananciales que tienen constituidas, por lo que únicamente son responsables los tres apelantes de referencia.
Además de las determinaciones de hechos que preceden, las partes estipularon los daños reclamados por el co-demandante, [Maldonado Santiago] en $300,000 y los de la co-demandaníe, [Cintrón Santiago] en $100,000.
Como consecuencia de estos hechos, el 24 de enero de 2000, el Ministerio Público presentó tres proyectos de denuncia contra los apelantes Lebrón Dávila, Lebrón Casanova y Cruz de Jesús por supuesta violación al Art. 94 del Código Penal de Puerto Rico, 33 L.P.R.A. see. 4031 (Agresión simple). Luego de la comparecencia de las partes y celebrada la vista bajo el procedimiento proscrito por la Regla 6 de las de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 6, el magistrado no determinó causa probable para el arresto de los tres apelantes mencionados. Ante ello, el Ministerio Público presentó ante el TPI una moción de autorización para acudir en alzada y dicho foro determinó causa para arresto. Celebrado el juicio, éstos fueron declarados no culpables.
Así las cosas, el 21 de noviembre de 2000, los aquí apelados instaron la acción de daños y peijuicios de referencia contra los apelados. En síntesis, se alegó que Lebrón Dávila, Lebrón Casanova y Cruz de Jesús le propinaron varios golpes en el pecho, cara y espalda a Maldonado Santiago. Como resultado de dicha agresión, Maldonado Santiago sufrió daños físicos, emocionales y materiales y no ha trabajado desde el 3 de diciembre de 1999, día en que ocurrieron los alegados hechos. La parte apelante contestó la demanda, no presentó defensas afirmativas y reconvino contra los apelados.
Tras varios trámites procesales, el 1ro de mayo de 2003, el TPI emitió sentencia mediante la cual declaró ha lugar la acción civil instada, condenó a los apelantes y a sus respectivas sociedades de gananciales y concedió a los apelados las cantidades antes mencionadas. En su consecuencia, el 15 de mayo de 2003, los apelantes presentaron una solicitud de determinaciones dé hechos adicionales a tenor con la Regla 43.3 de las de Procedimiento Civil. 32 L.P.R.A. Ap. m. De la solicitud, el TPI únicamente acogió la determinación adicional de hechos probados relativo a la ausencia de responsabilidad de las respectivas sociedades de gananciales compuesta por los apelantes y sus respectivas cónyuges.
En respuesta a lo anterior, el 15 de agosto del 2003, el TPI dictó la sentencia enmendada apelada mediante la cual reiteró las determinaciones de hechos y conclusiones de derecho de su sentencia anterior, esta vez relevando de responsabilidad a la sociedad legal de gananciales de cada uno de los apelantes.
Insatisfechos con dicho curso decisorio, los apelantes acuden ante nos. Como parte de los cuatro errores señalados, los cuales giran en tomo a la apreciación de la prueba y la valoración de los daños, refieren en primer lugar que el foro apelado erró al declarar ha lugar la acción instada en contra de los apelantes, cometiendo así error manifiesto, pasión y prejuicio en la evaluación de la prueba desfilada. En segundo lugar, los apelantes entienden que la cantidad de $45,000 concedida a la apelada Cintrón Santiago por concepto de daños morales no debe proceder por no haber sido alegada y por considerar la misma como injusta y excesiva. De igual manera, como tercer error, indican que la cantidad de $75,000 otorgados a Maldonado Santiago por concepto de sufrimientos y angustias mentales tampoco debe proceder por no haber sido considerada su alegada contribución para que se suscitara el altercado entre las partes y por considerarla excesiva. Por último, los apelantes arguyen que no se les debe condenar a pagar solidariamente las partidas concedidas porque no quedó probado común acuerdo entre los apelantes ni existe base alguna en la prueba que justifique dicha solidaridad.
Esbozados los hechos pertinentes al caso ante nos y con el beneficio de una exposición estipulada de la *656 prueba, procedemos a exponer el derecho aplicable.
n
Por estar estrechamente vinculados los cuatro errores planteados, discutiremos los mismos en conjunto.
A. Los daños y perjuicios y la valorización de los daños.
El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. Artículo 1802, 31 L.P.R.A see. 5141; Mun. de San Juan v. Bosque Real, Inc., opinión de 4 de marzo de 2003, 158 D.P.R. _ (2003), 2003 J.T.S. 33, a la pág. 636; Valle Izquierdo v. E.L.A., opinión de 14 de mayo de 2002, 157 D.P.R. _ (2002), 2002 J.T.S. 70. Daño es todo aquel menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra. García Pagán v. Shiley Caribbean, Etc., 122 D.P.R. 193 (1988). La culpa consiste en la omisión de la diligencia exigible, la que si se hubiera empleado podría haber evitado el resultado dañoso. Toro Aponte v. E.L.A., 142 D.P.R. 464 (1997). Se ha expresado que el concepto culpa reconocido en el Artículo 1802, supra, incluye cualquier falta de una persona que produce un mal o daño. Mun. de San Juan v. Bosque Real, Inc., supra; Valle Izquierdo v. E.L.A., supra; Leyva v. Aristud, 132 D.P.R. 489 (1993).
De conformidad con la referida disposición estatutaria, la reparación de un daño causado procede, siempre y cuando se demuestren varios elementos indispensables, sin los cuales no se configura causa de acción alguna que pueda ser reconocida bajo la doctrina de la responsabilidad civil extracontractual. Es norma conocida que el demandante, en una causa de acción por daños y peijuicios extracontractuales, tiene que probar: a) la existencia de una acción u omisión productora del acto ilícito extracontractual; b) la antijuricidad de la misma; c) culpa o negligencia del agente; d) producción de un daño; y e) relación de causa y efecto entre la acción u omisión y el daño. Mun. de San Juan v. Bosque Real, Inc., supra; Valle Izquierdo v. E.L.A., supra.
En nuestra jurisdicción, la norma reparadora del Artículo 1802, supra, es amplia y abarcadora. En principio, algunos daños son de naturaleza intangibles, como ló es el sufrimiento, las angustias mentales y los daños emocionales, por lo que se consideran daños no patrimoniales, debido a que su valoración pecuniaria no se funda en una equivalencia matemática. Aún así, no por eso dejan de ser compensables en dinero. Santini Rivera v. Serv Air, Inc., 131 D.P.R. 1, 7 (1994). Por consiguiente, al medir los daños en un caso, el juzgador debe hacerlo sobre una estricta base de correspondencia con la prueba, siempre procurando que la indemnización de los daños y peijuicios no se convierta en una industria y no resulte lesiva a nuestra economía. S.L.G. v. F. W. Woolworth and Co., 143 D.P.R. 76, 81 (1997); Atiles Moreu, Admor v. McClurg, 87 D.P.R. 865, 877 (1963). Este deber de los jueces tiene el propósito del sentido remediador y no punitivo que encama el Artículo 1802 del Código Civil, supra; S.L.G. v. F. W. Woolworth and Co., supra.
La responsabilidad civil por daños y perjuicios es precisamente el deber de resarcir al damnificado, otorgándole un valor económico al daño sufrido.’ El resarcimiento o indemnización pecuniaria consiste en atribuir al damnificado la cantidad de dinero suficiente para compensar su interés perjudicado. Es como una súbrogación real en que el dinero ocupará el lugar de los daños y peijuicios sufridos, y una aplicación pecuniaria que crea una situación patrimonial que equivale a la destruida por el daño causado. Id. Véase además: García Pagán v. Shiley Caribbean, Etc., supra; Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 455-456 (1985).
El derecho que deberá ser compensado por daños no puede derrotarse meramente por el carácter especulativo que en alguna medida supone el cómputo de daños. S.L.G. v. F. W. Woolworth and Co., supra, a la pág. 81 (1997); Odriozola v. S. Cosmetic Dist. Corp., 116 D.P.R. 485, 510 (1985). Por esto se ha resuelto que es una gestión o tarea difícil y estableciendo que los tribunales apelativos no deben intervenir con la estimación de *657 los daños que realicen los tribunales de instancia a menos que las cuantías concedidas sean ridiculamente bajas o exageradamente altas. Blás Toledo v. Hosp. Guadalupe, 146 D.P.R. 267, 339 (1998); S.L.G. v. F. W Woolworth and Co., supra, a la pág. 83; Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 178 (1996); Cotto Morales v. Ríos, 140 D.P.R. 604, 626 (1996); Rosado v. Supermercado Mr. Special, 139 D.P.R. 946, 954 (1996). Por ello, la parte que solicita la reducción de la indemnización concedida está obligada a demostrar la existencia de las circunstancias que hacen meritorio que se modifique. Blas Toledo v. Hosp. Guadalupe, supra; S.L.G. v. F. W. Woolworth and Co., supra; Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 179 (1996). "[L]a gestión judicial de estimar y valorar los daños en casos como el de autos, es difícil y angustioso, debido a que no existe un sistema de certera computación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas". Nieves Cruz v. U.P.R., opinión de 31 de mayo de 2000, 151 D.P.R. _ (2000), 2000 J.T.S. 91, a la pág. 1211. Véase también, Blas Toledo v. Hosp. Guadalupe, supra, a la pág. 339.
En consonancia con la controversia de marras, el resarcimiento de los daños como consecuencia de la fracturas ha sido revisado por el Tribunal Supremo en cuanto a la razonabilidad de la indemnización concedida. En Negrón García v. Noriega Ortiz, 117 D.P.R. 570 (1986), al considerar un accidente de tránsito en el que la motora del demandante fue impactada, lo tiró contra el pavimento y le ocasionó una fractura en el brazo derecho, el Tribunal Supremo redujo la cuantía concedida en el TPI de $8,000 a $7,000. Ajustado el valor de esta suma al presente, la compensación fluctuaría entre los $10,000 y $12,000. Véase A. J. Amadeo Murga, El Valor de los Daños en la Responsabilidad Civil, Editorial Esmaco, 2000, Vol II (Suplemento), págs. 321-326.
En Martínez v. Báez, 63 D.P.R. 783 (1944), al compensar al demandante por haber sufrido una extensa y fuerte contusión en el costado izquierdo que le produjo un choque traumático de la décima costilla izquierda y heridas leves y laceraciones en los brazos y muslos, el tribunal sentenciador le concedió la suma de $1,1000. En apelación se consideró excesiva la suma otorgada y se redujo a $500. Con posterioridad a ello, en Baralt v. Báez, 78 D.P.R. 123 (1955), al indemnizar a la señora Baralt por haber sufrido una contusión en la rodilla derecha, la fractura de tres costillas y una torcedura donde se juntan las costillas y el esternón, que la obligó a estar recluida tres (3) semanas en una clínica y le produjo severos dolores, el Tribunal Supremo redujo la cantidad concedida de $5,799 a $3,799 por considerar la misma como excesiva. Fíjese el lector que este caso data de 1955.
Cercana a la situación que nos atañe, nos correspondió atender los hechos acaecidos en Estremera v. ELA, KLAN-95-00325, Sentencia de 4 de septiembre de 1996, (panel integrado por los jueces Sánchez Martínez, Córdova Arone y Segarra Olivero), citado por Amadeo Murga, ob. cit., supra. Al fijar daños recibidos por Estremera relativos a fracturas de dos costillas y ante una prueba detallada de que con motivo de ello el demandante tuvo que acudir en diversas ocasiones al hospital, estuvo impedido de trabajar por una semana, dejando de percibir ingresos, de que su condición física le impedía levantar a su hija según acostumbraba, que no podía llevar a cabo tareas domésticas con normalidad, todo lo cual le causó dolores físicos y sufrimientos durante los siguientes ocho meses luego de la caída, modificamos la sentencia dictada por el TPI para aumentarla de $1,000 a $10,000.
De otra parte, en Lugo Dijols v. Tamayo Pasarín, KLAN-96-00814, Sentencia de 29 de septiembre de 1997 (Panel integrado por los Jueces Negrón Soto, Aponte Jiménez y Segarra Olivero), citado por Amadeo Murga, ob. cit., supra, al evaluar la razonabilidad de la valorización que el TPI hiciera del daño ocurrido y la indemnización concedida, modificamos las partidas adjudicadas, reduciendo las mismas a base del ajuste de cambio correspondiente. Véase Amadeo Murga, ob. cit, íd. En ese caso, el 31 de julio de 1993, Gladys Lugo Dijols sufrió un accidente de automóvil cuando su vehículo fue impactado por un vehículo conducido por Rafael Tamayo Pasarín. Como consecuencia del accidente, Lugo Dijols resultó con dos costillas rotas, hematomas en la cara, en el muslo y en el pie. El TPI declaró con lugar la demanda instada y valoró los daños en la cantidad de $15,000. Los demandados acudieron ante nos, alegando que la cantidad fijada como *658 compensación resultaba un abuso de discreción del TPI. Igualmente la cuantía de $3,000 adjudicada al esposo de ésta. Como parte del dictamen, esta Curia estimó procedente la rebaja de la cuantía adjudicada a Lugo Dijols de $15,000 a $10,000 y expresó:

“[E]s menester señalar que [Lugo Dijols] fue la única que declaró en cuanto a sus daños físicos y sufrimientos y angustias mentales. En resumen, testificó que sufrió la fractura de dos costillas, hecho que estimó probado el [TPI], Sobre esto no hubo ninguna otra prueba que pudo haber estado al alcance de dicha demandante, como radiografías e informes o certificados médicos. Ella fue conducida al hospital donde recibió tratamiento ambulatorio, sin que fuera recluida y sin que conozca detalle alguno de esos sufrimientos y angustias mentales.

En cuanto a la cantidad de $3,000 adjudicada a su esposo, confirmamos la misma a base de que le mereció el TPI credibilidad de que las relaciones sexuales se afectaron como consecuencia del accidente. ”

B. La apreciación de la prueba
Es norma claramente establecida por el Tribunal Supremo de Puerto Rico que en ausencia de error manifiesto, pasión, prejuicio o parcialidad, no se intervendrá al nivel apelativo con las determinaciones de hechos y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos. Trinidad García v. Chade, opinión de 18 de enero de 2001, 2001 J.T.S. 10, a la pág. 793; Colón y otros v. K-Mart y otros, opinión de 26 de junio de 2001,2001 J.T.S. 98, a la pág. 1484; Municipio de Ponce v. Autoridad de Carreteras, opinión de 29 de diciembre de 2000, 2001 J.T.S. 3, a la pág. 658; Monllor Arzola v. Soc. Legal de Gananciales, 138 D. P.R. 600 (1995).
Más aún, dispone la Regla 43.2 de las de Procedimiento Civil de Puerto Rico, 32 L.P.R.A., Ap. III, en lo pertinente, que “[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el Tribunal Sentenciador para juzgar la credibilidad de los testigos”.
Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia. Argiiello v. Argüello, supra. La determinación de credibilidad del tribunal sentenciador es merecedora de gran deferencia por parte del tribunal apelativo, por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, ya que él fue quien oyó y vio declarar a los testigos. íd.; Pueblo v. Bonilla Romero, 120 D.P.R. 92 (1987).
Aunque, de ordinario, el foro apelativo no interviene con la apreciación de la pmeba que hacen los foros judiciales de instancia, sí lo hace cuando un balance racional, justiciero y jurídico de la totalidad de la prueba y de los documentos que obran en autos lleva a conclusiones distintas a las del tribunal de instancia. Negrón Rivera y Bonilla, Ex Parte, 120 D.P.R. 61 (1987).
Un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985); Pérez v. Hosp. La Concepción, 115 D.P.R. 721, 728 (1984). No obstante, está claro que el arbitrio del juzgador de hechos es respetable, mas no absoluto. Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Véase, Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8 (1987).
III
En el caso de autos, la parte apelante nos solicita, en síntesis, que revoquemos la sentencia apelada a los *659 efectos de eliminar las partidas de $75,000.00 y $45,000 dólares otorgadas a las partes apeladas Maldonado Santiago y Cintron Santiago, respectivamente, por considerar dicha adjudicación como injusta y excesiva. La parte apelante, quien solidariamente fue condenada a pagar dichas cantidades, atribuye dicho error a que el TPI incidió en su apreciación de la prueba desfilada ante sí, demostrando error manifiesto, pasión y prejuicio. Les asiste la razón, en parte.
Habiendo estudiado con detenimiento el expediente ante nuestra consideración, así como la exposición estipulada de la prueba, llegamos a la conclusión de que corresponde modificar la sentencia apelada únicamente a los efectos de reducir las cuantías otorgadas a los apelados por concepto de los sufrimientos y angustias mentales sufridos como consecuencia de los daños ocasionados como resultado de los actos de los apelantes. Blás Toledo v. Hosp. Guadalupe, supra; S.L.G. v. F. W. Woolworth and Co., supra, a la pág. 83; Quiñones López v. Manzano Pozas, supra; Coito Morales v. Ríos, supra; Rosado v. Supermercado Mr. Special, supra.
En el caso ante nos, aunque entendemos que las fracturas de dos de sus costillas sufridas por el apelado Maldonado Santiago resultaron ser lesiones bien dolorosas, la valoración de los daños no se ajustó al cambio del nivel de precio ni de vida presentes en la compensación del daño moral por fracturas de dichos huesos, y la adjudicación hecha por el TPI es altamente excesiva. Negrón García v. Noriega Ortiz, supra; Martínez v. Báez, supra; Baralt v. Báez, supra. Véase, Amadeo Murga, ob. cit., supra. Además de los daños ocasionados por las fracturas, a Maldonado Santiago se le afectó su visión, su condición de epilepsia se agravó, su dentadura se aflojó, comenzó a padecer de insomnio, depresión severa, disfunción sexual, fluctuaciones en su estado de ánimo que afectaron sus relaciones sociales y familiares y deterioro en su capacidad laboral al verse impedido de trabajar como de costumbre, lo que a su vez afectó su condición económica de manera precaria. Comparados los daños sufridos por el apelado Maldonado Santiago, y las cuantías concedidas en los casos antes citados, entendemos que los mismos deben ser reducidos a $45,000.
En cuanto a los $45,000 adjudicados a su esposa, aun cuando le mereció el TPI credibilidad de que las relaciones sexuales se afectaron como consecuencia de la agresión física recibida por su cónyuge de parte de los apelantes y que además le produjo daños al verlo sufrir, reducimos la misma a $15,000.
IV
En vista de los fundamentos que anteceden, se modifica el dictamen apelado sólo a los efectos de reducir las indemnizaciones otorgadas de $75,000 a $45,000 en el caso de Maldonado Santiago y de $45,000 a $15,000 en lo que respecta a Cintron Santiago. Una vez modificadas dichas cuantías, se confirma la sentencia enmendada apelada.
Lo acordó el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIO 2005 DTA 3
1. A modo de elaborar los hechos pertinentes en el caso ante nuestra consideración, adoptamos sustancialmente las determinaciones de hechos desfiladas por el TPI, por considerar que las mismas encuentran apoyo sustancial en la prueba desfilada.